OHIO STATE LIFE INS. CO. *v.* BARRON.

1. INSURANCE—BENEFICIARIES—MURDER.
   A beneficiary cannot collect upon a policy of insurance on the life of a person he has murdered.

2. SAME—INSANE PERSONS.
   If an insane beneficiary kills insured under such circumstances as would amount to murder were beneficiary sane, such killing does not forfeit policy or bar right to recover insurance money.

3. SAME—HOMICIDE OF INSURED BY BENEFICIARY—INSANE PERSONS —EVIDENCE.
   On insurer's suit interpleading administratrix of insured wife's estate and administratrix of estate of husband beneficiary who killed his wife and then committed suicide, evidence *held*, insufficient to sustain finding that husband was insane at time of homicide, although tending to show he suffered mental abnormalities periodically, hence his estate may not recover insurance money.

Appeal from Lenawee; Rathbun (George A.), J. Submitted October 10, 1935. (Docket No. 57, Calendar No. 38,577.) Decided December 10, 1935.

Bill of interpleader by the Ohio State Life Insurance Company, an Ohio corporation, against Alice B. Barron, administratrix of the estate of Laura Ella Sneyd, deceased, and Sudie J. Green, administratrix of the estate of Charles B. Sneyd, deceased, to determine the rights of claimants under a life insurance policy. Cross-bills by defendants against each other. Decree for defendant Green. Defendant Barron appeals. Reversed.

*C. L. Peterson,* for plaintiff.

*Bourns & Helme,* for defendant Barron.

*Clark & Bean,* for defendant Green.

NORTH, J. Mrs. Laura Ella Sneyd was killed by her husband, Charles B. Sneyd, December 5, 1933. Immediately after committing the homicide Sneyd took his own life. Each of these parties had been married previous to their marriage to each other in October, 1930. Mrs. Sneyd was survived by four children of her former marriage; and Mr. Sneyd was survived by three children of his former marriage. They are also survived by one child born of their marriage. At the time of her death Mrs. Sneyd carried life insurance in the amount of $1,000. Her husband was the beneficiary. The insurance company paid the money into court and filed a bill of interpleader. The contest is whether the insurance shall be paid to the estate of Charles B. Sneyd or to the estate of Laura Ella Sneyd. In behalf of his estate it is claimed that Charles B. Sneyd was insane at the time he took the life of his wife, and that therefore the

homicide does not bar his taking under the insurance policy. But the representative of the estate of Laura Ella Sneyd denies the alleged insanity and asserts that because of the uxoricide the insurance should be paid to the Laura Ella Sneyd estate. The circuit judge found the alleged insanity established and entered a decree accordingly.

"Proof that the assignee of a policy of life insurance caused the death of the assured by felonious means is sufficient to defeat a recovery on the policy." *New York Mutual Life Ins. Co.* v. *Armstrong* (syllabus), 117 U. S. 591 (6 Sup. Ct. 877).

"In *Slocum* v. *Metropolitan Life Ins. Co.*, 245 Mass. 565 (139 N. E. 816, 27 A. L. R. 1517, 1521), it was held that a beneficiary (a husband) could not collect upon a policy of insurance on the life of his wife, whom he had murdered. The court said: 'The same principle of public policy which precludes him from claiming directly under the insurance contract, equally precludes him from claiming under the statute of descent and distribution.' Many authorities are cited to sustain this holding." *Garwols* v. *Bankers Trust Co.*, 251 Mich. 420, 431.

"Where an insane beneficiary in a life policy kills the assured under such circumstances as would cause the killing to be murder if the beneficiary were sane, such killing does not cause a forfeiture of the policy nor bar his right of recovery for the insurance money." *Holdom* v. *Ancient Order United Workmen*, 159 Ill. 619 (43 N. E. 772, 31 L. R. A. 67).

Decision herein is controlled by a single issue of fact, *i. e.*, Was Charles B. Sneyd insane at the time of the homicide? The case was tried at length in the circuit court and 25 witnesses testified. From the record it appears that Charles B. Sneyd at the time

of the tragedy was 48 years of age. At times he suffered from extremely severe pains in the head. This condition caused him to say and do things indicating a lack of sanity. It seemed to result in a discharge from the ears by which he would be relieved. In the later months of his life he drank moonshine whiskey and frequently became intoxicated. He was a man of high temper. He wrongfully accused his wife of unfaithfulness and threatened her with bodily harm, causing her to live in fear of him for months immediately preceding the killing. During this period they lived apart from each other and for some time prior to her death she would not permit him to enter her house to see her or the children unless some other person was present. Sneyd became suspicious of his relatives and friends, claiming they were all against him. He threatened bodily harm to his own brother, to his son, Walter, and to another man who was a friend and employee. Notwithstanding such abnormal conduct, he operated a poolroom and more recently his small farm in the manner of a normal man except possibly for his exhibitions of bad temper and drunkenness.

The testimony discloses some insanity in the Sneyd family, but each of the two instances of insanity was accompanied by explanatory circumstances or conditions. It may be conceded that Charles B. Sneyd at times appeared to be a man of deranged mentality, possibly insane; but his conduct doubtless was largely due to intoxication. For much of the time his course in life was such as to conclusively indicate he was a sane person. Those with whom he came in contact dealt with him as a sane person to the last day of his life. The most that can be said is that at times he was mentally irresponsible. Periodically he was mentally abnormal, possibly insane. But

with periodic exceptions he was a reasonable being, wholly responsible for his own acts.

This case must be decided in the light of what the testimony shows as to whether Charles B. Sneyd was sane or insane at the time he took the life of Mrs. Sneyd. Three witnesses saw him within a very short time prior to the tragedy and under circumstances that enable them to give convincing testimony as to his condition at that time.

The homicide occurred about 11 o'clock in the forenoon of December 5, 1933. About nine o'clock that morning Sneyd went with his sister, Mrs. Louise Jones, in her automobile to his wife's residence. He there talked with his wife and their little child for some time. He then went with his sister in her automobile to the down town portion of Adrian. Mrs. Jones testified:

"He was perfectly all right that morning. He seemed as well as I ever see him that morning."

While down town and for approximately two hours that forenoon Sneyd was in the poolroom of Alexander Birchfield, where the two visited and talked about business matters, and Sneyd bought candy which he took to the home of his wife where he went very soon after leaving the store. Of Sneyd's conduct and condition Birchfield testified:

"I would not say he was mentally unbalanced. * * * I would judge I was there two hours with him in the pool room. * * * He was absolutely all right. I didn't notice he was at all nervous. He was just as normal as could be. * * * When he left my place he was just as calm and cool as I had ever seen him in my life. * * * It was about an hour after he left before I heard of the tragedy. In my estimation he hadn't been drinking."

The third of these witnesses, Mrs. Electa Drake, was at the home of Mrs. Sneyd when the latter's husband came there from the poolroom. This witness talked with Sneyd, saw him give candy to the children and to his wife, heard him talking to and playing with the children. This was but a few minutes before the killing which occurred immediately after Mrs. Drake left the premises. She testified:

"Charlie Sneyd was in possession of all his mental faculties when I saw him there that morning. Never saw anything. He didn't say a thing out of the way. Nothing to make me think there was anything wrong, not one thing, and when he committed the act of killing his wife, I believe he was in possession of his faculties at that time; it was devilishness, that's the whole of it."

Conceding that Charles B. Sneyd may have been periodically mentally afflicted, even temporarily insane, we think it almost conclusively appears from the record in this case that at the time he killed his wife his mentality was such as rendered him responsible for the homicide. We think the failure of the trial judge to arrive at this conclusion was due to the fact that he inadvertently based decision upon testimony bearing upon Sneyd's general mental condition rather than that disclosing his condition at the time of the homicide. It is a fair inference from the opinion filed by the circuit judge that he had some doubt as to whether the testimony established that Sneyd's mentality was such as to render him irresponsible for the homicide. The judge stated:

"I am frank to admit that if said Charles B. Sneyd had not taken his own life, and were on trial for the murder of his wife, I would be very reluctant to find him insane."

From the record before us we are constrained to hold that the decree entered in the circuit court should be set aside and one entered in this court in accordance herewith.   Costs to appellant.

POTTER, C. J., and FEAD, WIEST, BUTZEL, BUSH-NELL, and EDWARD M. SHARPE, JJ., concurred.

The late Justice NELSON SHARPE took no part in this decision.