## Sobel v. The National Bank and Trust Company of Erie, etc.

*Charles D. Cowley*, for plaintiff.

*Paul A. Stephany*, for defendant.

LAUB, J., May 3, 1950.—This is a so-called "amicable action in assumpsit" in which, by motion and stipulation, both parties ask for an adjudication based upon an agreed set of facts. A complaint has been filed in simulation of an adversary proceeding, and both parties have asked for judgment upon that one pleading as bolstered by factual stipulations which

they have filed in the case. The agreed facts are as follows:

On June 19, 1948, Elizabeth Johnson attacked her husband, Ernest F. Johnson, with a knife and inflicted wounds upon him which brought about his death on the following day. On June 21, 1948, while being held in the Erie County Prison on a charge of murder, Elizabeth Johnson was adjudged insane and was committed to Warren State Hospital where she is now confined. It is conceded that she was insane at the time of the assault.

Ernest F. Johnson's life was insured and Elizabeth Johnson was named beneficiary in the policies of insurance. The proceeds from these policies have been paid over to defendant as stakeholder pending the outcome of this lawsuit. By agreement this has eliminated the insurance companies as parties to the litigation.

The sole question before us at this time is whether the Slayer Act of August 5, 1941, P. L. 816, 20 PS §3441 et seq., prevents the guardian of Elizabeth Johnson from receiving the insurance money or whether it must go to the estate of deceased.

Section 2 of the act, supra, provides generally that no slayer shall, in any way, acquire any pecuniary benefit as the result of decedent's death. Section 11 applies particularly to situations where the slayer is the beneficiary in any insurance policy on decedent's life and provides that where the policy has no alternative beneficiary not claiming through the slayer, the proceeds are to be paid to the estate of decedent. This section, if applicable here, means that plaintiff must prevail, for no alternative beneficiary was named in the policies.

The course of the litigation must follow the construction to be placed upon the term "slayer" as that term is used in the statute, and the public policy of

the Commonwealth as therein stated. In section 1 of the act we find the following definition:

"The term 'slayer' shall mean any person who participates, either as a principal or as an accessory before the fact, in the wilful and unlawful killing of any other person."

Although this act has reference to proceedings in the civil branches of the courts, and although the term "wilful" has been used frequently in civil proceedings, particularly in trespass actions, the use of such words as "principal", "accessory before the fact" and "unlawful" draws us like a magnet to the criminal law for enlightenment. This is true notwithstanding the repeal of former statutes on the subject which destroyed a slayer's right to inherit where the slayer had been ". . . finally adjudged guilty, either as principal or accessory, of murder of the first or second degree". See Act of June 7, 1917, P. L. 429, sec. 23; Act of June 7, 1917, P. L. 403, sec. 22 (the former supplied by Act of April 24, 1947, P. L. 80, and the latter supplied by the Act of April 24, 1947, P. L. 89, in both of which the language used is similar to the Act of 1941 now under consideration). Furthermore, section 15 of the Slayer Act declares the intention of the statute to be declarative of the public policy of this State "that no person shall be allowed to profit by his own wrong, wherever committed". The word "wrong" considered in connection with the previous use of the words "wilful" and "unlawful", implies a criminal rather than a merely negligent act. Furthermore, there are no accessories before the fact to anything but crimes in our legal system.

It is conceded by all parties that the killing of Ernest Johnson was unlawful in the sense that it bore no sanction of law. Therefore, we are constrained to inquire whether the killing was wilful. Black's Law Dictionary (3rd ed.) defines "Willful" as "Proceeding

from a conscious motion of the will; voluntary". But such definition is not of too much value, for a reading of the cases indicates that the term has many hues and shades. In statutes proscribing acts not malum in se, the term apparently means "knowingly" or "intentionally" merely. It is given a darker meaning in statutes involving moral turpitude and usually means "evil purpose", "criminal intent" or "malevolent design". See United States v. Illinois Central Railroad Co., 303 U. S. 239, 58 S. Ct. 533, 535. Mr. Justice Agnew, in the most famous of all Pennsylvania cases, Commonwealth v. Drum, 58 Pa. 9, said: ". . . if an intention to kill exists, it is wilful", thus establishing the term as synonymous with intentional, a conclusion reached by the Superior Court in Commonwealth v. Frederick, 27 Pa. Superior Ct. 228, 230. See also Cover v. Hershey Transit Co., 290 Pa. 551, 556, where the term wilful or wanton injury as used in trespass actions was described thus: "In this sense wilful means intentional, while wanton signifies a reckless disregard of the rights of others. To be wilful or wanton, the act must have been done with knowledge."

But in a broad sense every voluntary act of a human being can be said to be intentional and therefore "wilful". Is this the interpretation of the word which must be applied in cases of the character involved here? Is the mere commission of a voluntary act resulting in death to another to be construed as a wilful killing where the volition originates in a diseased mind? Blackstone formulated a general answer to these questions when he said (book 4, ch. II, par. 21):

"Where there is no discernment there is no choice, and where there is no choice there can be no act of the will . . . : he, therefore, that has no understanding can have no will to guide his conduct."

It is proper for the text writers to generalize in this fashion, but courts must be slow to decide par-

ticular issues upon such foundation. It would be easy to accept, as universally applicable, the pronouncements made by eminent text authorities in point for they seem to be unanimous in holding that the insanity of a beneficiary who kills the insured removes any bar denying such beneficiary the proceeds of the insurance. Appleman, Insurance Law and Practice, volume 1, part 3, §384, states:

"Clearly, where the beneficiary was insane at the time of the homicide, there is no moral turpitude involved either in the act itself or in the recovery of the policy proceeds. . . ."

Vance on Insurance, p. 599 (quoted with approval in National Life and Accident Ins. Co. v. Turner (La.), 174 So. 646, 648), says bluntly:

"If, however, the death of the insured was caused under such circumstances as do not amount to felony, as when the killing was accidental or in self-defense or *where the beneficiary was insane,* the rights of the beneficiary are not affected." (Italics supplied.)

29 Am. Jur. 979, section 1310, puts it this way:

"Nor in the absence of a provision in the contract requiring a contrary conclusion, does the killing of an insured person by an insane beneficiary in a life insurance policy forfeit the policy or bar a suit for recovery thereon, although the killing was done under such circumstances that it would have been murder if the beneficiary had been sane."

A leading foreign precedent on the subject, Holdom v. Ancient Order of United Workmen, 159 Ill. 619, 43 N. E. 772, concludes with this statement:

"Where an insane beneficiary in a life policy kills the assured under such circumstances as would cause the killing to be murder if the beneficiary were sane, such killing does not cause a forfeiture of the policy, nor bar his right of recovery for the insurance money."

In the course of the opinion (which held that no question of public policy was involved in the litigation) this was said (p. 622):

"The liability (of a lunatic for certain of his torts) is in no way dependent upon the intent or design to commit the act, for a lunatic can have no will and can form no design or intent, and would not be liable for a tort wherein the intent is a necessary ingredient."

Statements of a similar nature appear elsewhere; for example, Judge Morgan, in the dissenting opinion to Grand Circle Women of Woodcraft v. Rausch, 24 Colo. App. 304, 134 Pac. 141, said (p. 317): " 'The act of an insane man is morally no more his act than if it were mechanical.' " In New York Life Ins. Co. v. Veith, 192 S. W. (Tex.) 605, 607, it was declared:

"The amended answer alleged the insanity of appellee when her husband was killed, and although, in connection with that plea, it is alleged 'that the death of the said Simon Veith was caused by the plaintiff, who feloniously slew him', it is a proposition which cannot be sustained in law, for an insane person could not be a felon. The insane person is incapable of committing a crime, and insanity at the time the offense was committed is an absolute defense."

Even the A. L. I. Restatement of the Law of Restitution §189 (by reference in comment (d) to Section 187(e)), without qualifying the designation "insane" in any way, eliminates from application of the section situations where an insane beneficiary kills the insured.

It is entirely probable that loose references to "insanity" as set forth above results from thinking in terms of murder and manslaughter, assuming the type of insanity involved to be that which constitutes a defense to crime.[1] As a matter of fact, in our Com-

---

[1] See Metropolitan Life Ins. Co. v. McDavid et al., 39 Fed. Supp. 228, which, in an excellent review, explains why the courts have, in deciding slayer-beneficiary cases, stated the rules too broadly.

monwealth at least, general insanity which fails to meet certain tests is not a defense to murder. In Commonwealth v. Hallowell, 223 Pa. 494, 501, it was said:

"However unsound in mind a man may be generally, it is only when he has lost utterly his power of moral perception that he ceases to be responsible in the eye of the law."

Thus, under our statute which in part describes first degree murder to be "willful, deliberate and premeditated", it is entirely possible for an insane person to be convicted of murder. This being true, it is apparent that our law affirms the ability of a generally insane man to commit a wilful act. It is evident, therefore, by the terms of the Slayer Act, now under consideration, that an insane beneficiary could wilfully and unlawfully kill an insured and, in consequence, be barred from recovering the insurance proceeds. This destroys the value, as precedent, of any case or pronouncement which broadly states the rule to the contrary.

But, while a generally insane man may possibly commit a wilful murder, it is also true that in some circumstances the characteristics of a generally insane condition so deprive the patient of freedom of moral action that he could not be said to have done a wilful act. This was decided earlier in Sayres v. Commonwealth, 88 Pa. 291. In that case President Judge Ludlow, of the Philadelphia courts, was sustained in his charge to the jury that general insanity avails a defendant if it be "so great in extent and degree, as to blind him to the natural consequences of his moral duty, and he must have utterly destroyed his perceptions of right and wrong". It was there further stated of general insanity that it constitutes a defense if the disease causes defendant to lose "that control of his mental powers which renders him a responsible being".

From this we conclude that the important thing for us to decide in this case is the type of insanity from which Elizabeth Johnson was suffering when she killed her husband. It will not do to content ourselves merely with the designation of her condition as insane for that does not tell whether she could do a wilful act as designated in law.

Reference to Elizabeth Johnson's commitment papers, which we are authorized to consider by stipulation of the parties, reveals that she suffers from "schizophrenia, paranoiac type". The commitment further discloses that she is homicidal, deluded, hallucinated and of criminal tendency. It shows that she believes she is being persecuted by people who own a "gadget" which is used to control and torment her. It further indicates that she killed her husband because she was commanded to do so by the voice of God.

Gray, in his Attorney's Textbook of Medicine, 3rd ed., par. 98.02, treats schizophrenia and dementia praecox as synonymous terms. Of the paranoid type of dementia praecox, he says (in par. 98.10) :

"These people are dangerous. Their persecutory ideas may at any moment lead to retaliation. Their delusions and hallucinations make them believe that others are attempting to harm them. Defense may lead to tragedy." See also Maloy, Nervous and Mental Diseases (pp. 386, 387).

In the light of this it cannot be said that Elizabeth Johnson "wilfully" slew her husband. Her act involved no degree of conscious wrong. It was so much the act of her disease and so little her own deed that it might well have been committed by a third person.

But not to insist upon the strict interpretation of the word "wilful" as that term may be understood in criminal law, scrutiny of the public policy of this Commonwealth, as defined in section 15 of the Slayer Act, supports the conclusion we are about to reach. As

indicated above, the term "wrong" clearly means something more than a mere undesigned tort. It implies a wilful wrong in the sense of an iniquitous, designing deed. A brief journey into the history of the Slayer Act supports this construction. In Carpenter's Estate, 170 Pa. 203, it was held that a murderer's heirs could inherit from the murdered person because the courts were powerless to interfere with the provisions of the intestate laws regarding descent and distribution. This decision prompted the passage of the Act of June 7, 1917, P. L. 429, which denied the slayer's right to inherit from his victim if he had been "finally adjudged guilty, either as principal or accessory, of murder . . .". In the subsequent case of Tarlo's Estate, 315 Pa. 321, the Supreme Court reluctantly affirmed the right of a slayer's heirs to take under the estate of the murdered person because the slayer had committed suicide shortly after the killing and could not, therefore, be adjudged "guilty" of the murder in the criminal courts which had jurisdiction to make such an adjudication. It is entirely probable that the present Slayer Act was the result of the Tarlo decision, for the majority opinion in that case concludes with the observation that any change in the law requires legislative action, and Mr. Justice Drew (now chief justice), in a separate opinion, concurred in the result "hoping that the legislature in its wisdom will so change the law that, on facts such as those which have caused our division, the question of guilt will be submitted to and determined by a jury".

With this history before us it becomes apparent that the legislature was seeking to proscribe enrichment as the result of iniquity, not incidental enrichment without conscious fault as appears here. Mr. Chief Justice Frazer, in his separate dissent to Tarlo's Estate, supra, discussed the question of the slayer's re-

sponsibility in connection with the right of others to take under the slayer, and concluded (p. 328):

"If . . . he was insane and as a result of that condition or because of some other legal reason not chargeable for his act, the next of kin should participate in the distribution. . . ."

By permitting the guardian of Elizabeth Johnson to recover in this case, we feel we are not only not transgressing the public policy of the Commonwealth but rather obeying the dictates of logic and common sense.

And now, to wit, May 3, 1950, judgment is entered for defendant in the amount of $4,984.25.