NAKAT PACKING CORP. et al. v. UNITED STATES.

AMERICAN CAN CO. et al. v. UNITED STATES.

NORTHERN ELECTRIC CO. et al. v. UNITED STATES.

Nos. 5744-A, 5745-A and 5746-A.

District Court, Alaska.

First Division, Juneau.

July 8, 1952.

R. E. Robertson, Juneau, Alaska, George W. Clarke and Fred G. Clarke, Jr., Seattle, Wash., for plaintiff.

Patrick J. Gilmore, Jr., U. S. Atty., Edward A. Merdes, Asst. U. S. Atty., Juneau, Alaska, for defendant.

FOLTA, District Judge.

By the foregoing actions, consolidated for trial, the plaintiffs seek to recover damages aggregating more than $400,000 under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., as a result of a fire on October 31, 1946, which totally destroyed plaintiff Nakat Packing Corporation's cannery at Union Bay, Alaska, and some property of the plaintiffs American Can Company and Northern Electric Company. The remaining plaintiffs, having paid part of the losses under policies of insurance, sue as subrogees.

The fire was discovered about 2:30 a. m. in a lean-to in which the United States Army maintained and operated two gasoline generating units for the purpose of supplying current required in connection with the operation of its communication facilities. There was no other equipment in the lean-to from which the fire could have originated, nor had anyone been in the building for four hours prior to the fire.

The plaintiff Nakat Packing Corporation, hereinafter referred to as the plaintiff, contends that the fire was caused by the negligence of the defendant in the installation, operation and maintenance of the generating units and the fuel system, which supplied them, and also relies on the doctrine of res ipsa loquitur. The defendant has denied all the acts of negligence alleged and in addition has pleaded, as against the Nakat Packing Corporation, the defenses of contributory negligence and assumption of risk. A further defense under Section 2680 (a), Title 28 U.S.C.A., was stricken on motion at a preliminary stage. By stipulation, only the question of liability was tried.

The plaintiff permitted the defendant to install its communication equipment in what is referred to in the testimony as the plaintiff's radio shack and the generating units in a lean-to at the rear thereof. The operating personnel of the cannery departed at the close of the season's canning operations about September 20th, leaving one watchman in charge of the plant. The defendant completed its installation about October 14th and left one Granata, a private, in full charge as operator, with no other duties to perform and with no assistance available nearer than Ketchikan, about forty miles distant by water.

The defendant intended to install a fuel tank of 550-gallon capacity in immediate proximity to the generating plant, but the plaintiff's superintendent objected and suggested that fuel be obtained from the plaintiff's storage tank located 350 feet away, apparently to minimize the risk of fire. Plaintiff installed a gravity-feed pipe line from the storage tank without any device to trap sediment, water and other foreign substances in the fuel.

The condition of the engines at the time of installation was unknown. They had been bought new in 1942 and used thereafter, but defendant's records failed to disclose the extent of prior use, whether the engines had been subsequently reconditioned or what their condition then was. After being started they were observed for a short time and found to be operating satisfactorily. An 18-year-old private,

wholly inexperienced and with little, if any, knowledge of gas engines, their maintenance or care, was left in charge without a manual, a grease gun. or tools, and permitted to sleep in another building 112 feet away.

The exhaust pipes, where they emerged from the lean-to, were not equipped with a collar or thimble to prevent contact with the surrounding wood during periods of vibration or from sagging, and the defendant was unable to show how the horizontal runs of the exhaust pipes were supported.

It appears from the testimony that the proper installation for engines of this kind is a suction-feed fuel system, involving the use of a fuel pump, with which most gas engines, including the ones under discussion, are equipped by the manufacturer. In the instant case the fuel pumps were not used, and of course they were not required with a gravity-feed system. With a gravity-feed system, if a leak or break occurs in the line at or near the engine, gasoline would nevertheless continue to flow, thereby creating a fire hazard, the gravity of which would depend on the location of the leak and the temperature of the engine, whereas in a suction-feed system the fuel pump would cease operating upon the occurrence of a leak or a break in the system. The defendant apparently concedes this but argues that it was prevented from installing a suction-feed system by plaintiff's disapproval of its plan to install the 550-gallon storage tank near the lean-to, to which the plaintiff replies that it did not suspect that a gravity-feed system would be installed, and that in any event such disapproval would not justify an improper installation.

It appears to be undisputed that, where an operator is not in constant attendance to detect any mechanical difficulty immediately, the engine should be equipped with automatic switches to shut off the engine when it overheats or the oil pressure or level is too low. Moreover, proper care calls for frequent greasing particularly of rapidly moving parts, like the fan and water pump shaft in the instant case, and, where

the fuel system is of the gravity-feed type without any device in the line to trap water, sediment and foreign substances, the carburetor screen and needle valve should be cleaned periodically to prevent backfiring and overflowing, and drip pans installed under the engines to catch oil or gasoline.

The units were alternated in operation 24 hours at a time. On October 17th the lights were flickering. An inspection disclosed that the carburetor on the operating unit was leaking. There was also other trouble. The fan belt was slipping, not because of the failure to make a readjustment for tension but evidently because the shaft was frozen from a lack of lubrication; and the engine was overheated and not operating at its normal speed. Granata reported the difficulty to Ketchikan. The cable ship "Lenoir" with the witness Smith aboard was promptly dispatched to Union Bay. In the meantime a fisherman had cleaned out the carburetor screen and needle valve and reassembled the carburetor. All that the witness Smith did was to make a cursory inspection and listen to the sound of the engine, apparently in the absence of Granata, who was aboard the "Lenoir" taking a shower bath. It does not appear what, if any, information was imparted to Granata with respect to the care of the engines. Under the circumstances, it was his duty to instruct Granata so that he could have taken some rather elementary precautions to avoid a recurrence of the trouble.

On October 27th it appears that the fan and water pump shaft froze from a lack of lubrication. On the same day the plaintiff's assistant watchman arrived with a grease gun for Granata. The other unit was then put into continuous operation, with no servicing thereafter, so far as the testimony shows, except checking the water level and replenishing the oil in the crankcase.

At about 2:30 a. m., October 31st, the lights again flickered. The fire was discovered immediately. It was described as pouring out of the lean-to. The lights went out in a few seconds thereafter.

It was shown by the testimony that the engines were made by the International Harvestor Company; that this type of engine has been on the market for many years, and that it could not cause a fire if properly installed, serviced and maintained. It is obvious that, if this were not so, there would be no market for it.

It thus appears that the defendant had ample warning of disaster. It was shown that lack of grease in such rapidly moving parts as the fan and water pump shaft in this case would eventually freeze the shaft, thus depriving the engine of the cooling stream of air from the fan, which in turn would result in overheating, slowing down of the engine, excessive vibration and backfiring. If at the same time there was a leak in the carburetor from failure to keep the screen and needle valve clean, the gasoline or resultant vapor could be ignited by backfiring or by an overheated exhaust manifold. Similarly, overheated, uninsulated exhaust pipes could ignite the wall, and also particles from a slipping fan belt could be blown against the manifold, ignited and in turn set fire to gasoline vapor or an oil-soaked floor.

From the foregoing I find that the defendant was negligent in the following particulars:

(1) In installing a gravity-feed system.

(2) In installing a gravity-feed system of such length without any device to trap water, dirt and other foreign substances in the fuel, which eventually clog the carburetor screen and the needle valve and result in backfiring and overflowing of the carburetor and overheating.

(3) In not installing drip pans under the engines.

(4) In not equipping the exhaust pipes with collars or thimbles, or in lieu thereof supports of such a nature as to preclude contact with the exterior wall of the lean-to.

(5) In not equipping the engines with devices which would automatically shut off the engines when the oil pressure or level was too low or the water temperature too high.

(6) In entrusting the operation, servicing and maintenance to an inexperienced person lacking any knowledge of the proper care of such machinery.

(7) In failing to instruct the operator in the care of the engines after the difficulty experienced on October 17th and 27th.

(8) In failing to provide the operator with a manual, grease gun and tools.

(9) In failing to require him, because of his ignorance and inexperience, to sleep in the adjoining room where he could detect any mechanical difficulty in time to prevent fire.

I also find that such negligence caused the unit in operation at the time to catch fire, which was communicated to the lean-to, and that these acts of negligence were the proximate cause of the fire which destroyed the plaintiff's cannery and the property of the plaintiffs American Can Company and Northern Electric Company, from which I conclude that the plaintiffs are entitled to recover damages in such amounts as may be proved at a subsequent hearing. This conclusion necessarily involves the finding that the defenses of contributory negligence and assumption of risk have not been sustained.