PHYLLIS ANDERSON, SPECIAL ADMINISTRATRIX OF
ESTATE OF KATHERINE GRASBERG, AND OTHERS
v. ALFRED GRASBERG, ALSO KNOWN AS
ALF T. GRASBERG, INCOMPETENT, BY
JOHN H. GRASBERG, GUARDIAN.

78 N. W. (2d) 450.

June 29, 1956—No. 36,793.

*Harry H. Peterson* and *V. J. Hermel,* for appellant.

*Stetson & Jacobson* and *Robert W. Nyquist,* for respondents.

MURPHY, JUSTICE.

Defendant, an incompetent, by his guardian, appeals from a judgment decreeing that he was legally sane on June 10, 1952, thereby making the killing of his wife felonious; and decreeing as a result that one-half of the real property held by him and his wife in joint tenancy before her death, and the income therefrom, is to be held in trust for her lawful representative and heirs at law, who are plaintiffs herein. The case was heard and determined upon facts submitted to the trial court upon the written stipulation of counsel.[1]

Defendant Alfred Thomas Grasberg, who is now 44 years of age, and Katherine Grasberg were married on September 24, 1949. Katherine had previously been married to one Hjalmer Anderson with whom she had had two daughters. They are both plaintiffs in this action as heirs and next of kin of the deceased—and one also as special administratrix of the estate of Katherine Grasberg. Katherine and Alfred lived together on a farm in East Side Township of Mille Lacs County about 3½ miles from the village of Isle. Prior to their marriage defendant had owned this farm property consisting of approximately 121 acres which became their homestead. On October 24, 1951, Alfred had the title to the property placed in both himself and Katherine as joint tenants and not as tenants in common so that title would pass by survivorship to the other upon the death of either without probate proceedings. Katherine had not paid any part of the purchase price of the property.

---

[1]The facts of this case have been taken from an agreed statement of facts as well as from exhibits presented to the trial court by stipulation, which include inter alia three statements taken from the defendant by the county attorney not long after the killing and the transcript of proceedings had on the arraignment and commitment of defendant to the state asylum for the dangerous insane under a criminal indictment for first-degree murder.

Although they had minor domestic quarrels on the average of about once a week, Alfred and Katherine lived together without a great deal of discord. Some of the disagreements occurred because, according to Alfred, Katherine would laugh at the way he would do his farmwork and try to impose her way of doing it on him. More of their disagreements seemed to center around Alfred's belief that the farm community was holding him up to ridicule because he thought he was being accused of having undermined Katherine's marriage to Hjalmer Anderson, her former husband. Actually, however, Alfred felt that it was Katherine who had tricked or framed him into the marriage as he had felt himself obligated to marry her after having had sexual relations with her while she was still married to Hjalmer. Other quarrels resulted from Alfred's suspicions that Katherine was secretly seeing other men. Although he never became aware of any facts to fully substantiate his suspicions and Katherine denied any faithlessness, he felt that the "terrible dreams, dirty dreams" he had at night were the result of dope she had given him so that she might keep clandestine meetings. In the months prior to Katherine's death, several quarrels originated out of Alfred's notion that Katherine was trying, as he expressed it, to "crack me up." She would respond to his queries on various domestic affairs by answering that he had already asked that particular question some time before and that she had answered the same question then. It was such a quarrel that led to the tragedy that took place on June 10, 1952.

On the morning of June 10, 1952, Alfred and Katherine had an altercation over whether Alfred had or had not asked her the night before how much cream they had got from some milk which had recently been taken from a fresh cow. Then, after doing some chores, Alfred drove to the creamery at Isle between 8 and 9 a. m. and after making some purchases went to the liquor store between 9 and 9:30 a. m. where he remained for about five hours during which, although the exact number is not clear, he had not more than seven to nine mixed whiskey drinks.

While at the liquor store, Alfred brooded over all the past quarrels he had had with Katherine and thought of doing away with her at his

first opportunity. He cashed a check at the liquor store and was heard to say, "I won't need this [money] any more." He bought several drinks for other persons in the store, and tried to give away his dog. He also asked the manager of the liquor store if, "When I'm making twine [presumably in the state prison] will you send me a card?" The four witnesses at the liquor store stated that Alfred did not appear to be excessively under the influence of liquor when he left for home.

After driving back to the farm about 2:45 p. m. he found his wife sleeping on the davenport in the living room. He felt ill and, without waking her, went to the bedroom where he slept for about an hour. Upon awakening he was nauseated and, after relieving himself, had a cold lunch which he found on the dining-room table. At that point, about 4 p. m., and after having mulled the early morning's quarrel over in his mind, he went up on the landing where he kept his .32-calibre rifle and brought it downstairs. He then loaded the rifle, took partial aim at his wife sleeping on the davenport, and pulled the trigger killing her instantly. Not being able to find the keys to his truck, the defendant then walked to the highway where he gave a passing motorist a dollar bill and told him to notify the sheriff. He then decided to walk toward town to meet the sheriff and, after getting a ride, stopped at a resort along the highway where he had three bottles of beer. He then retraced his steps to his farm, stopping off at a second resort along the way to have another bottle of beer. When he arrived home about 7 p. m., the sheriff, a doctor, and two other men had arrived and were carrying out his wife's body. Alfred told the authorities that he had killed his wife and told them where the gun was that he had used.

In a statement taken from the defendant shortly after the killing, he said that the reason he shot his wife was "because of the quarrels and because I felt that she was always nagging me and that I had to stop the quarrels and nagging." In a second statement taken upon interrogation the following day, the defendant said that he had killed his wife so as to clear his mind about several things. These things included his beliefs that he had been framed into the

marriage and that she had been seeing other men and in addition his suspicion that she had been stealing the milk, eggs, and coffee which they had on hand, because they disappeared so quickly. Also, he claimed that he often heard her call him vile and vulgar names at times when they were not quarreling.

On June 18, 1952, defendant requested the county attorney of Mille Lacs County to come to the Stearns County jail where he was being detained. He there stated that "my number is up" and that because he was tired of lying around jail he wanted action, whereupon he gave the county attorney a piece of paper bearing the following writing:

"Isle, Minn.
"June 18, 1952.

"a request

"The hour is near. This is straight from my *Heart,* so I'll make my decesion my best possible choice that I can see. I would like to be shot next Tuesday eve. at 4 o'clock, June 24th. *but* first would like *liberty* until then to go around and see my wife's grave. also to be with my Dad, my dog, my sister, and little Ruth. Have my pick-up to drive around *unmolested,* you understand. Would like to have firing squad made up of Legion members from Isle Post 405. The firing to take place on Isle Ball Park. Would like very much to have this granted. Wire President Truman. Wire the Governor. On my word of honor will keep *this* promise so help me God.

"All my life I've been *watched* and sinned to much to be a good Christian and when I sinned in the Navy the F.B.I. had me watched and followed so my number is up.

"Signed
"Alf Thomas Grasberg
"Isle, Minn.

"*action*

"action immediately.

"P.S. I took a life and am willing to give mine in return for my *Country.*

"I broke all the commandments in the Bible. God have mercy on my sole."

An indictment against the defendant for first degree murder was returned by the Mille Lacs County grand jury on October 13, 1952. At the arraignment on October 15, defendant pleaded not guilty. Prior to the return of the indictment, the court, upon the request of both counsel for defendant and the state, had ordered the defendant to be examined by Dr. Burtrum C. Schiele of the University of Minnesota Hospitals in an effort to determine defendant's mental condition. This examination was carried out and the matter came on for hearing on November 3, 1952. After Dr. Schiele testified, the court found the defendant to be insane with homicidal tendencies and therefore incapable of standing trial[2] and ordered him committed to the state asylum for the dangerous insane at St. Peter, where he is presently interned for safekeeping and treatment until such time as he would be able to stand trial.

On March 2, 1955, a different trial court, in the civil action here, upon the facts and exhibits as stipulated by counsel and without additional testimony being taken, concluded that the defendant was legally sane at the time he killed his wife. As a result of this finding, and while recognizing the survivorship principles of joint tenancy, the trial court, in presuming that death would have occurred simultaneously for Alfred and Katherine had he not feloniously taken her life, ordered that Alfred hold one-half of the real property formerly

---

[2]M. S. A. 610.10 provides in part that "No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; * * *."

M. S. A. 631.18 provides: "When any person under indictment or information, and before or during the trial thereon and before verdict is rendered, shall be found to be insane, an idiot, or an imbecile, the court in which such indictment or information is filed shall forthwith commit him to the proper state hospital or asylum for safe-keeping and treatment; and when at such time any such person shall, in addition, be found to have homicidal tendencies, such court shall forthwith commit him to the asylum for the dangerous insane for safe-keeping and treatment; * * *."

held in joint tenancy and the income therefrom in trust for the lawful representative and the heirs at law of Katherine.

■ Both parties cite the recent case of Vesey v. Vesey, 237 Minn. 295, 54 N. W. (2d) 385, 32 A. L. R. (2d) 1090. In that case, which arose on demurrers, a wife as joint owner of a joint and several bank account with her husband allegedly caused his death by coercing him to walk through deep snow on a cold and windy day while knowing of her husband's heart condition and knowing that any exertion might be fatal to him. It was held that the wife's alleged action constituted a felonious killing and that as a result a constructive trust should be imposed upon the balance of the bank account for the benefit of the estate of the deceased husband. In imposing the constructive trust upon the total remainder in the account, the court recognized[3] the widely divergent allocations by other courts of property which had been held in tenancies by the entireties or joint tenancies in similar cases[4] but based its decision upon the nature of the bank account there involved, for it was several as well as joint thus entitling either joint owner to withdraw the whole amount at any time.

In addition, it was pointed out in the Vesey case that M. S. A. 525.87,[5] which prevents anyone who feloniously takes the life of another from inheriting from or receiving any interest in the estate of such person, was not applicable because the survivor did not take from the estate of the deceased joint owner but rather took by virtue of the original contract of deposit. Similarly, here we hold that by virtue of the survivorship aspects of a joint tenancy the survivor's interest rests upon the original conveyance or contract and is not

[3]Vesey v. Vesey, 237 Minn. 295, 303, 54 N. W. (2d) 385, 389, 32 A. L. R. (2d) 1090, 1097.

[4]Note, however, the subsequent reappraisal of the view which had permitted the killer to take regardless of his wrongful act, Welsh v. James, 408 Ill. 18, 95 N. E. (2d) 872, by the Illinois Supreme Court in Bradley v. Fox, 7 Ill. (2d) 106, 129 N. E. (2d) 699.

[5]This section provides in part: "No person who feloniously takes or causes or procures another so to take the life of another shall *inherit* from such person or *receive any interest in the estate of the decedent,* or take by *devise* or *bequest* from him any portion of his estate." (Italics supplied.)

a part of the estate of the deceased, thereby making the statute inapplicable.[6] However, under the ruling in the Vesey case, varying portions of the survivor's interest may be required to be held in constructive trust for the benefit of those taking the decedent's estate.

We are thus brought to the major issues presented by this appeal, namely: (1) Should insanity temper the rule of the Vesey case that a killer may not profit by the killing of his joint tenant; and (2) assuming the answer is in the affirmative, was the defendant Alfred Grasberg insane at the time he killed his wife, Katherine.

■ In giving effect to the equitable doctrine that a person should not profit by his own wrong, a constructive trust may be imposed whenever the legal title to property is obtained under such circumstances that it would be unconscionable for the holder of the legal title to retain and enjoy the beneficial interest.[7] When the killer is insane, however, examination is necessary to determine whether the basis upon which the doctrine rests still exists. Insanity has been recognized in all civilized countries as a defense against punishment for crime, and this has been so because, if the perpetrator is so mentally diseased that he does not have the intent or animus in the commission of the crime, the act lacks the elements which constitute the crime the law seeks to punish.[8] These general principles would seem to apply with equal vigor in determining whether the survivor has committed a legal wrong in killing his joint tenant, for if his mind was so diseased that it was the disease and not his own will which caused the act to be committed, it cannot fairly be said

[6]See, e.g., Wenker v. Landon, 161 Ore. 265, 88 P. (2d) 971 (real property held in tenancy by the entireties); Beddingfield v. Estill & Newman, 118 Tenn. 39, 100 S. W. 108, 9 L.R.A.(N.S.) 640 (real property held in tenancy by the entireties); Di Lallo v. Corea, 19 Pa. D. & C. 282 (joint bank account); 24 Minn. L. Rev. 430.

[7]Vesey v. Vesey, 237 Minn. 295, 54 N. W. (2d) 385, 32 A. L. R. (2d) 1090; Restatement, Restitution, § 187, *comment a.* See, Ames, Lectures on Legal History, *"Can a Murderer Acquire Title by his Crime and Keep it?"* p. 310; Cardozo, Nature of the Judicial Process, pp. 42, 43.

[8]Smoot, Law of Insanity, § 448; Miller, Criminal Law, § 36; 49 Harv. L. Rev. 722.

that he has committed a wrong for which the law should upset the customary legal rights of property ownership. Although no joint tenancy case directly in point has been found,[9] this proposition is supported in the decisions of courts which have been faced with analogous problems.

Matter of Eckardt, 184 Misc. 748, 54 N. Y. S. (2d) 484, presented a case in which a wife, who was found to be insane, killed her husband with whom she held real property in a tenancy by the entirety. In addition to holding that the wife could share in her husband's estate and take the proceeds from a life insurance policy, the surrogate court held that because of the wife's insanity she committed no legal wrong; that the principle barring one from profiting from his own wrong did not apply; and that therefore she acquired full ownership of the real property held by her and her husband as tenants by the entirety. In addition to this case, similar holdings may be found in cases where the rule against permitting a person to take a distributive share of his victim's intestate estate has not been applied where the killer was insane at the time of the killing. Thus, in In re Pitts [1931] 1 Ch. 546, the estate of an insane husband who murdered his wife and son and then committed suicide was permitted to take the husband's distributive share of the victims' estates. The same rule was applied in In re Estate of Mason, 23 Br. Col. L. R. 329, 31 Dom. L. R. 305; In re Houghton [1915] 2 Ch. 173; and Petrillo v. Hanley, 29 Pa. D. & C. 512. In Hoffman's Estate, 39 Pa. D. & C. 208, a similar result was reached under a statute preventing any person finally adjudged guilty of first or second degree murder from inheriting or taking any part of the property of the person killed.[10]

[9] Although in Welsh v. James, 408 Ill. 18, 95 N. E. (2d) 872, which involved property held in joint tenancy, and which arose on a motion to dismiss, the defendant was apparently insane at the time he killed his wife (see, Bradley v. Fox, 7 Ill. [2d] 106, 110-112, 129 N. E. [2d] 699, 702), but the court awarded all the property to the survivor on grounds other than insanity, and the opinion itself is not clear as to whether or not the killer was insane at the time he killed his joint tenant.

[10] The Minnesota statute, § 525.87, does not require a prior conviction. See footnote 5, *supra*.

An analogous rule in the area of insurance law is that, where the beneficiary of a life insurance policy intentionally causes the death of the insured, the beneficiary may not profit by his own wrong and neither he nor anyone claiming through him may receive any benefit under the insurance contract;[11] but that if the wrongdoer be insane the rights under the policy are not affected.[12] The leading case on the problem is Holdom v. A. O. U. W. 159 Ill. 619, 43 N. E. 772, 31 L. R. A. 67, and it has since been followed by other cases.[13] In light of the above cases and on the basic proposition that if the killer is found to be insane at the time of the killing he could not have the requisite intent and the principle of profiting from one's own wrong is inapplicable, a finding of insanity will not permit the imposition of a constructive trust as illustrated in the Vesey case.

The next questions to be determined are (1) what degree of insanity will vitiate the equitable principle that one should not profit from his own wrong, and (2) does the mental condition of defendant Grasberg at the time he killed his wife, Katherine, come within that standard.

In determining that Alfred was not insane at the time of the killing, the trial court made the following finding of fact:

"* * * He [Alfred] knew at all times that it was unlawful to kill Katherine. He knew that he would be punished by imprisonment if

---

[11]Vance, Insurance (3 ed.) § 117; 1 Appleman, Insurance Law and Practice, § 381; Grossman, *Liability and Rights of the Insurer when the Death of the Insured is Caused by the Beneficiary or by an Assignee*, 10 Boston U. L. Rev. 281; see, in general, 35 Minn. L. Rev. 415.

In Minnesota this rule is incorporated into statute, § 525.87.

[12]Vance, Insurance (3 ed.) § 117; 1 Appleman, Insurance Law and Practice, § 384; 10 Boston U. L. Rev. 291.

[13]Ohio State Life Ins. Co. v. Barron, 274 Mich. 22, 263 N. W. 786; Matter of Eckardt, 184 Misc. 748, 54 N. Y. S. (2d) 484; Sobel v. National Bank & Trust Co. 71 Pa. D. & C. 321; see, Tippens v. Metropolitan Life Ins. Co. (5 Cir.) 99 F. (2d) 671, 675. But see United States v. Kwasniewski (E. D. Mich.) 91 F. Supp. 847, 35 Minn. L. Rev. 415, which recognized rule but refused to apply it in case involving killing during moment of temporary insanity induced by emotional disturbance.

he killed her. His act was wilful, premeditated, and consummated as planned."

The court followed the rules laid down in McNaghten's Case, 10 Clark & F. 200, 209, 210, which determined that a person "is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law"; and "that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." See, State v. Scott, 41 Minn. 365, 370, 43 N. W. 62, 64. This so-called "right-and-wrong" test has been attacked as being obsolete because it ignores the great advances made in the science of psychiatry which recognize "that a man is an integrated personality and that reason, which is only one element in that personality, is not the sole determinant of his conduct." Durham v. United States, 94 App. D. C. 228, 237, 214 F. (2d) 862, 871, 45 A. L. R. (2d) 1430, 1441, 39 Minn. L. Rev. 573. The evidence on the question of the defendant's insanity consisted of the testimony of the court-appointed witness, Dr. Burtrum C. Schiele, taken in the criminal proceeding,[14] a letter to the trial judge by Dr. Schiele, a letter to plaintiff's counsel from a Dr. N. J. Berkwitz, and the statements of seven lay persons who had observed the defendant on the day of the killing.

Dr. Schiele, director of the Psychiatric Service at the University of Minnesota Hospitals, with some 15 years' experience at the university as a psychiatrist and whose time was almost exclusively devoted to the study of psychiatric cases, testified as to the prior medical history of the defendant, and after examining the defendant pursuant to the criminal trial court's orders gave his diagnosis of the defendant's mental condition. It is significant that one year before the killing, on the advice of his sister, the defendant went to

---

[14]The transcript of this testimony was received as evidence in the proceeding by stipulation. See footnote 1, *supra.*

the clinic at the University of Minnesota Hospitals for a psychiatric examination. At that time, June 26, 1951, he had complained, according to the doctor, that "his wife must have been doing something to him because he felt so sleepy following a large meal, and at other times he vomited, and he thought he was being poisoned or drugged in some way." The medical report indicated that the physician who examined him at that time found Grasberg was suffering from a paranoid psychosis and referred him to the psychiatric clinic; however, Grasberg had not complied with this recommendation.

On the court's order the defendant was admitted to the University of Minnesota Hospitals on the morning of October 20, 1952, and discharged on the afternoon of October 22, 1952. During that time the defendant was given thorough physical, mental, and psychological examinations by a number of the staff and was under constant observation by the personnel. Dr. Schiele personally conducted examinations on the latter two days, and after Grasberg's discharge the staff had a conference during which they arrived at their conclusions. In his letter to the trial judge in the criminal proceeding Dr. Schiele stated that they had diagnosed the defendant's condition as paranoid schizophrenia; that he suffered from delusions of reference and persecution; and that they deemed him legally insane at that time as well as on the day of the killing.

In testifying before the judge, Dr. Schiele indicated that the defendant had a typical history of paranoid personality going back to some point in early life. While in the Navy the defendant had been worried about a sexual experience of which others had knowledge and he felt that other men were watching him and talking and laughing about it. He also heard voices calling him derisive names. Then he began to feel that the F. B. I. was watching and following him. He said that after his marriage he began to suspect his wife was doping him, and, in addition, he told how he observed his wife flashing signals with a flashlight and mirror to people on the highway at night. He had made other observations which had indicated to him that strange and suspicious things were going on, for example, the clothes on the clothes rack in the morning were rearranged

from the way he remembered them the night before; the pick-up truck was parked at a different angle than he had remembered it being parked. From these facts and others the doctor concluded that the defendant was suffering from paranoiac schizophrenia. After examining the defendant's "request" to be shot by legionnaires after notification of the President and Governor[15] and the statements given by the defendant after his arrest, the doctor felt that these exhibits reinforced his initial findings and that the defendant was legally insane at the time he was to go on trial[16] and on the day of the killing.

Dr. N. J. Berkwitz, a psychiatrist and neurologist, did not personally examine the defendant but, at the request of counsel for plaintiffs, drew his conclusions from the transcript of the criminal proceedings; statements from the lay witnesses which, for the most part, indicated that the defendant appeared normal on the day of the killing; and the statements taken from the defendant after his arrest. He agreed with Dr. Schiele that the defendant "has had a definite paranoid trend" which dated back at least to the time he served in the Navy in 1945 and 1946. Dr. Berkwitz stated in his letter of November 12, 1953, to plaintiffs' counsel:

"* * * he developed marked hatred towards persons who would not agree with him or thwart him. It is obvious that he had projected his feelings of inferiority and guilt towards his wife and as time passed he developed a marked hatred and hostility towards her."

However, it was Dr. Berkwitz's opinion that on the day of the killing the defendant "knew the difference between right and wrong and had full realization of its legal consequences." He went on to say, "There is ample evidence that definite premeditation existed in his mind as he had mulled his plans prior to the commission of the crime."

Counsel for plaintiffs contend that the record supports the trial court's finding that the defendant was not "laboring under such a defect of reason * * * as not to know the nature of his act, or that it was wrong," and cites State v. Scott, 41 Minn. 365, 43 N. W. 62,

[15]This "request" is fully set out in this opinion above.

[16]See footnote 2, supra.

among others, to indicate the embodiment of the McNaghten rules of insanity in § 610.10. This section provides in part as follows:

"* * * [A] person * * * shall not be excused from *criminal* liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes [viz., idiocy, imbecility, lunacy, or insanity], as not to know the nature of his act, or that it was wrong." (Italics supplied.)[17]

Counsel for the defendant, on the other hand, contends that the evidence compels a finding that the defendant was legally insane under this standard at the time when he killed his wife and that thus the killing was not "felonious" under the ruling in the Vesey case.

Since the term "felony" is defined by § 610.01 as a crime "which may be punished by death, or by imprisonment in the state prison or state reformatory" and includes within its broad classification offenses in which intent may not be an essential element, the term does not necessarily have the same application in both civil and criminal cases. We are concerned here with whether customary application of normal rules of property should be outbalanced by the equitable doctrine that one should not profit by his own wrong, and not whether society has decreed through statute that criminal punishment should or should not be imposed. Since there are different social policies underlying these two basic issues, the indiscriminate use of the label "felonious" might well produce an undesirable result.[18]

---

[17]The remainder of § 610.10 is quoted in footnote 2, *supra*.

[18]See, Minasian v. Aetna Life Ins. Co. 295 Mass. 1, 3 N. E. (2d) 17; Metropolitan Life Ins. Co. v. McDavid (E. D. Mich.) 39 F. Supp. 228; 35 Minn. L. Rev. 416, note 9; 1 Wharton, Criminal Law (12 ed.) § 26. In Hatcher v. Aetna Life Ins. Co. (D. Ore.) 105 F. Supp. 808, a wife pleaded guilty to the crime of "Assault with dangerous weapon" after having killed her husband in a drunken altercation. This crime constituted a "felony" under Oregon law and the court was faced with a problem of whether the wife could take the proceeds from her husband's insurance in spite of a statute which prevented one who "feloniously takes" the life of the insured from recovering the proceeds. The court there held that, in

In Sobel v. National Bank & Trust Co. 71 Pa. D. & C. 321, the court had to determine whether a statute, preventing one from taking insurance proceeds as a beneficiary if he "wilfully" and "unlawfully" killed the insured, applied to a killer who while being held on the charge of murder was adjudged insane and committed to a state hospital. It was conceded that the killer was "insane" at the time of the assault which resulted in the death. The court there indicated[19] that difficulties arise when "insanity" is always thought of simply in terms of what will constitute a defense to crime and pointed out that the important thing to determine is what type of insanity the killer had in ascertaining whether the act was "wilful" under the statute there involved.

In testifying in the criminal proceeding, Dr. Schiele described the condition which the defendant had as follows:

"Q. Would you amplify your statement by stating, at least in general terms, what are the characteristics of this [paranoid schizophrenia] condition?

"A. There are quite a few variations, but in general, a paranoid schizophrenia is a slowly developing condition in which a person's emotional life is pretty well tied up with suspicions and doubts and fears and uncertainties, many times which plague him for years and years before they become evident to other people. He is no longer—

spite of the commission of a "felony," the wife could take the proceeds because her crime was not "intentional and wrongful" which was the requirement before the statute was enacted, and that thus her act though wrongful was not a "felonious taking" within the meaning of the Oregon disinheritance and forfeiture statute.

The court speculated as to whether the offense of manslaughter would come within the purview of the Oregon disinheritance statute and said (105 F. Supp. 811):

"Would the Oregon courts hold that a son whose reckless driving caused his parents' death, could not inherit from the parents? I think not. Would the Oregon courts hold that a wife, whose negligent driving of the family automobile caused her husband's death, forfeited her claim as beneficiary under her husband's life insurance policies? I feel sure they would not rule that way."

[19]71 Pa. D. & C. 326 to 328.

by the time he had developed a series of paranoid ideas or delusions he is no longer a free person to act as the rest of us do in the world on the basis of what is going on around us. He is too heavily influenced by these feelings. They usually take the form of persecution of some form, to explain his failure or shortcomings or his unhappiness. Many times a person may be able to work and live and act quite normally most of the time except for the interference produced by paranoid thinking, feeling and acting.

\* \* \* \* \*

"Q. May we reasonably expect a person suffering from this condition to commit acts of violence?

"A. I think they are more apt to than normal people, but a great many thousands of them don't.

"Q. And this in many cases is prompted, I presume, by their delusions of persecution?

"A. That's right.

"Q. They feel impelled to do what they do *although they know that what they do is forbidden*?

"A. I think so.

"Q. That is, *a man may know that it is against the law to do an act, but he feels some superior force commanding him to do the thing that he does*? Does that express it?

"A. In many cases, yes. *I think that is true here.*" (Italics supplied.)

From this testimony it becomes obvious that the use of the "right-and-wrong" test of insanity, which has been replaced in at least one jurisdiction insofar as criminal responsibility is concerned,[20] would not be appropriate in this case where the defendant apparently knew that what he did was wrong, and yet it was his mental disease and

---

[20]Durham v. United States, 94 App. D. C. 228, 214 F. (2d) 862, 45 A. L. R. (2d) 1430, 39 Minn. L. Rev. 573. See, also, State v. Pike, 49 N. H. 399, 6 Am. R. 533; State v. Jones, 50 N. H. 369, 9 Am. R. 242.

Minnesota's standards of criminal responsibility are incorporated into § 610.10. See footnote 17, *supra*, and text thereto; see, also, Weihofen, Mental Disorder as a Criminal Defense, p. 148.

not his own conscious act that caused the death of his wife. In the Sobel case the court said (71 Pa. D. & C. 328) :

"Reference to Elizabeth Johnson's commitment papers * * * reveals that she suffers from 'schizophrenia, paranoiac type'. The commitment further discloses that she is homicidal, deluded, hallucinated and of criminal tendency. It shows that she believes she is being persecuted by people who own a 'gadget' which is used to control and torment her. * * *

* * * * *

"* * * it cannot be said that Elizabeth Johnson 'wilfully' slew her husband. Her act involved no degree of conscious wrong. It was so much the act of her disease and so little her own deed that it might well have been committed by a third person."

While the court there had a problem of defining "wilful" under a statute, we have a like problem here in determining whether the defendant had the intent to perform a wrongful act. In the absence of this requisite intent, there is lacking the basis upon which the court should act in interrupting the normal course of recognized property rights and relationships.

The fact that Alfred committed the act knowing it was wrong with full realization of its consequences should not be considered in a vacuum apart from the disease which produced the act. We feel that the better rule to be applied to the case before us is that the slayer will not be barred from taking the property where his unlawful act was the product of mental disease. In light of the present-day medical knowledge of the nature of mental diseases, it is not realistic to apply the arbitrary right-and-wrong test to the facts in this case.[21]

The record is replete with evidence supporting both doctors' testimony that defendant was afflicted with a serious mental disease at the time when he killed his wife, and we find that there was a sufficient causal relation between the disease and the killing to warrant a finding that it was the defendant's insanity and not his own

---

[21]We are not here concerned with the test to be applied in determining criminal responsibility; that question is controlled by § 610.10.

conscious act which caused the death of his wife. Therefore, the equitable principle that one should not be permitted to profit by his own wrong does not apply to the facts in this case and a constructive trust will not be imposed.

Reversed.

DELL, CHIEF JUSTICE (dissenting).

On the issue of the defendant's insanity, I think we have before us nothing but a pure question of fact which the lower court, on the evidence, was justified in deciding as it did.

Exceptionally able and experienced counsel for defendant in his brief states:

"Consequently the question here is whether or not the defendant was legally insane within the meaning of the statute [M. S. A. 610.10] as so interpreted in the Scott case." (State v. Scott, 41 Minn. 365, 43 N. W. 62.)

The case was tried and decided in the lower court on this principle of law, namely: Was defendant laboring under such a defect of reason as not to know the nature of his act or that it was wrong? It was briefed and argued here on the same principle and I do not think we should go beyond that principle of law since to do so makes the test too fine and the consequences too grave and serious. If there is to be a change in the law, and this I do not advocate, it should come in a case where the issue is squarely presented and adequately briefed and argued—not as here where both parties and the court proceeded on the same theory under the principle above stated.

On June 11, 1952, the day after the killing, the defendant was interrogated by the county attorney and the questions and answers were taken down by a court reporter and transcribed. The transcript accounts for 46 pages of the printed record. A careful reading of it, in my opinion, fails to disclose any apparent mental weakness or deficiency. It appears to be coherent and the likely story of a premeditated murder. From it, in sequence, the following appears: Defendant's deceased wife, in 1949, was the wife of Hjalmer Anderson. They were divorced in August of that year and in September, the following month, she married the defendant. While the wife of

Anderson she made improper advances to the defendant and finally there were secret meetings. They slept together and had sexual relations before she was divorced. Anderson talked to the defendant concerning divorce. Before the divorce was granted defendant asked her to return to her husband but this she did not do. After their marriage defendant's sister told him that Anderson claimed that defendant had stolen his wife. Defendant said that because of this talk his standing in the community had been lowered and he had been ridiculed. Their married life was not pleasant. There was frequent quarreling, nagging by her, and some difficulty over money matters. He felt that she had tricked him into marriage. He claimed that her relations with a named resort owner for whom he worked were improper. From what he described concerning her conduct, her treatment of him, and his experience with her while she was the wife of Anderson, it appears that there were reasonable grounds for his suspicion. There is nothing in the record to dispute or deny this claim. He had given some thought to doing away with her. The morning of June 10, 1952, they quarreled more than usual and he decided to kill her. He said that he needed some whiskey in order to commit the act so he went to town and, after going to the creamery, spent a long time in the liquor store where he consumed between seven and nine drinks of whiskey and made statements which, in the light of subsequent events, clearly showed that he was planning the murder. When he returned home his wife was sleeping. After further deliberation he shot and killed her while asleep. He then attempted to hitchhike to town so as to give himself up to the sheriff but was unable to obtain a ride. He gave one driver a dollar bill and asked him to call the sheriff. He walked to a resort where he drank three bottles of beer. Later he returned to his home and was arrested.

Seven people, acquaintances of his, who talked to and observed him that day either in the liquor store or at a resort described his actions and conversation as perfectly normal. One man had known him for nine years and another since defendant was a boy. The man who knew him from boyhood talked to him in the liquor store while they consumed three drinks of whiskey.

Dr. N. J. Berkwitz of Minneapolis, a specialist in psychiatry and neurology, examined the transcript prepared by the court reporter above referred to; the copy of the narrative statement given by the defendant to the authorities on June 10, the day of the killing; a transcript of the statement of the defendant taken at St. Cloud on June 18; a transcript of proceedings in the district court at Milaca on October 15; a copy of the note entitled "a request" dated June 18; and copies of the signed statements of the seven acquaintances above referred to. All of these instruments were made a part of the evidence by stipulation of the parties and were before the court for consideration in making its decision. Dr. Berkwitz, basing his opinion upon these instruments, stated that while defendant had a "paranoid condition," "there was no evidence that his intelligence was impaired"; that the defendant's vomiting shortly before he shot his wife "would seem to me to be the normal reaction of a person who had decided to do a bloody job of murder against which his very instincts revolted, which naturally would affect his digestive juices"; and that the evidence was such as to "convince me personally that he [defendant] knew exactly what he was doing"; also that "There is ample evidence that definite premeditation existed in his mind as he had mulled his plans prior to the commission of the crime." He further said that "a paranoid state is a fairly common condition."

Taking the record as a whole it seems to me that the court was justified in finding that at the time the defendant killed his wife he was not suffering from such defect of reason or impairment of his mental faculties as to excuse his acts. The fact that he had paranoid trends is not in itself controlling for, as Dr. Berkwitz points out, it is common knowledge that many people have paranoid trends and yet are legally sane and accountable for what they do. And whether four months after the killing he was insane so as to be incapable of standing trial is beside the point. The question is what was his condition at the time of the killing? Viewing the record as a whole and all reasonable inferences to be drawn therefrom, it seems to me that the court could reasonably find that the defendant planned the murder, that he had a motive for it, that he knew what he was doing was not right but wrong, and that, in fact, his reason-

ing powers and mental condition were such as to make him fully responsible for his acts under any theory. While the testimony of Dr. Burtrum C. Schiele would have permitted a finding to the contrary, it was not such, in the light of the entire record, in my opinion, as to compel such a finding. For these reasons I respectfully dissent.

THOMAS GALLAGHER, JUSTICE (dissenting).

I concur in the dissent.