**STATE of Minnesota, Respondent,**

v.

**Isaac BROWN, Appellant.**

**No. C0–82–536.**

Supreme Court of Minnesota.

Feb. 24, 1984.

Phillip S. Resnick, Robert G. Davis, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Charles H. Salter, Asst. County Atty., Minneapolis, for respondent.

PETERSON, Justice.

Defendant, Isaac Brown, was convicted of first-degree murder of Police Officer Richard Miller in violation of Minn.Stat. § 609.185(4) (1982) (intentional killing of a peace officer engaged in the performance of official duties). That defendant shot and killed Officer Miller is undisputed. On appeal, however, defendant raises various alleged errors at trial and the unconstitutionality of the intentional killing of a peace officer statute, section 609.185(4). We affirm.

On August 25, 1981, defendant; his brother, Roberto Lynn Brown; and defendant's girl friend, Evetta Cotton, drove defendant's stolen pickup truck to 16th Street and Girard Avenue in North Minneapolis. Evetta drove the truck while defendant sat in the passenger seat and Roberto laid on the truck bed under a camper top. Defendant wanted to sell stolen stereo equipment to Raymond Samuels, who lived in a house at the corner of 16th and Girard. Defendant and Samuels negotiated for approximately 15 minutes over the price of the stereo equipment.

During defendant's conversation with Samuels, Officer Miller, dressed in full uniform and in a police squad car, drove along side the truck and asked, "Whose car is

this? Whose car is this?" Officer Miller was responding to a stolen vehicle report given to the police by a friend of the truck's owner. As Miller emerged from his squad car and approached the truck, defendant got out of the truck and said, "Ah, officer, everything's all right. Everything's cool." Defendant then unzipped a pouch, pulled out a revolver, and shot Miller at least three times in the chest. Miller pulled his revolver from his holster and attempted to return fire. Defendant panicked and ran across the street, whereupon defendant emptied his revolver in the direction of Officer Miller. After radioing for help, Miller collapsed next to his squad car. The coroner testified that Officer Miller's death was the result of six gunshot wounds caused by five bullets.

Defendant and Evetta ran from the scene and hid for 3 days in a friend's apartment in South Minneapolis. A minister, a family friend, was sent by Evetta's mother to talk to defendant. The minister convinced defendant that he should surrender and accompanied him to the police station.

Upon arrest, defendant displayed brief emotional distress. He was given time to calm down, and he was read his *Miranda* rights before he gave his six-page confession.

Defendant was indicted by the grand jury on one count of murder in the first degree under section 609.185(4). A jury trial was held in Hennepin County District Court before the Honorable Patrick W. Fitzgerald. At the close of the trial, the jury was instructed on one count of first-degree murder and the lesser offense of second-degree murder. The jury returned a verdict finding defendant guilty of intentional murder of a peace officer in violation of section 609.185(4), and the trial court sentenced him to life imprisonment.

1. The first issue raised on appeal centers on the trial court's admission into evidence of a statement defendant made to the police on April 7, 1981. The facts surrounding the April 7, 1981, incident are as follows.

During the early morning of April 7, 1981, defendant and a friend, Jamie Dixon, drove in Dixon's vehicle to the vicinity of Dunlap and Ashland Avenues. Responding to a call to investigate suspicious activity, St. Paul Police Officers Patrick Lyttle and Mike Keller saw defendant and Dixon standing in the street. The officers pat searched both men for the purpose of checking for weapons, placed them in the squad car, and questioned them to determine what they were doing in the neighborhood.

Officer John McCreight arrived at the scene as a backup in response to the original call. He proceeded to examine Dixon's vehicle. With his flashlight, McCreight searched the exterior and interior of the vehicle. From the passenger window, he saw a pair of num-chucks, oriental fighting sticks, protruding from under the front seat. The transportation or possession of num-chucks is a misdemeanor under St. Paul Legislative Code § 225.06(2).[1]

After Officers Lyttle and Keller drove defendant and Dixon to Dixon's vehicle, McCreight asked Lyttle to examine the num-chucks still inside Dixon's vehicle. McCreight then entered Dixon's vehicle and seized the num-chucks and also seized a

---

1. Num-chucks are an assault weapon. Transportation or possession of them is a misdemeanor under St. Paul Legislative Code § 225.06(2), which reads, in pertinent part:

 **Transportation of firearms, assault weapons, or knives.** It shall be a misdemeanor to transport firearms, assault weapons, or knives in any manner other than enumerated herein:

 \* \* \* \* \* \*

 (2) Assault weapons and knives.
 (a) In a motor vehicle only if the assault weapon or knife is placed in a secured container and located in the trunk of the vehicle; except if there is no trunk the assault weapon or knive must be placed in a secured container and placed in the farthest rear portion of the vehicle.

 (b) Not in a motor vehicle only if the assault weapon or knife is in a secured container and is being carried between the home or business of the owner and a motor vehicle, weapons dealer, hunting area, or an officially recognized competition.

small plastic bag of marijuana from under the center armrest.

Officer McCreight asked Dixon whether the seized items belonged to him. Dixon denied owning them and said that they belonged to defendant. Defendant thereupon admitted ownership of the num-chucks and marijuana.

Defendant was arrested, was placed in Officer McCreight's squad car, and was read his *Miranda* rights. While McCreight was driving defendant to police headquarters, defendant and McCreight briefly discussed defendant's offense and bail. Sometime later during the ride, defendant voluntarily and without interrogation told McCreight that "the next time that he's arrested, he is going to make sure that he has his pistol with him and that we would never take him alive again. He was going to take a few cops with him too."

The trial court denied defendant's pretrial motion to suppress this statement. At trial, the court properly restricted testimony to the facts surrounding defendant's statement. Only Officer McCreight testified, and his testimony was limited to the immediate circumstances surrounding defendant's voluntary statement. There was no testimony at trial regarding defendant's alleged crime of possession of an assault weapon.

■ Defendant contends that his statement of April 7, 1981, should have been suppressed because the police conduct constituted an illegal arrest and an illegal search and seizure. Defendant's argument that he was illegally arrested is unsupported by the evidence. When Officers Lyttle and Keller responded to a suspicious activity call, they had the right and duty to investigate suspicious behavior. *See State v. Fish*, 280 Minn. 163, 167, 159 N.W.2d 786, 789 (1968). The officers' investigatory stop and subsequent "pat down" search were justified because the officers knew of defendant's past criminal behavior. As articulated at trial, they had a reasonable factual basis for believing that defendant might be armed and dangerous to the officers. *See Terry v. Ohio*, 392

U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

■ Defendant supports his illegal arrest argument by asserting that the officers should have issued him a citation in lieu of making a custodial arrest. Minnesota Rules of Criminal Procedure, Rule 6.01, subd. 1(1)(a), sets forth the standard to be used in determining whether Officer McCreight was justified in placing defendant under custodial arrest for a misdemeanor violation. Rule 6.01, subd. 1(1)(a) reads, in pertinent part:

> Law enforcement officers acting without a warrant, who have decided to proceed with prosecution, shall issue citations to persons subject to lawful arrest for misdemeanors, unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation.

Because Officer McCreight was aware that defendant had previously failed to appear for citations issued to him, McCreight could reasonably conclude that there was a substantial likelihood that defendant would again fail to respond to a citation if issued. Thus, McCreight's decision to place defendant under custodial arrest was justified.

■ Defendant's contention that police conduct in seizing the num-chucks and marijuana amounted to an illegal search and seizure is without merit. The officers entered Dixon's vehicle, not defendant's, to seize the items. Defendant failed to establish any "legitimate expectation of privacy" regarding Dixon's vehicle. Thus, he lacks standing to attack the alleged illegal search and seizure. *See United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ Moreover, we hold that the trial court properly admitted defendant's statement because, after he was placed in Mc-

Creight's squad car and was given a *Miranda* warning, defendant voluntarily and without interrogation made the statement to Officer McCreight. There was no evidence that McCreight did anything to induce the statement or that the statement could in any way be deemed involuntary.

2. Defendant's next contention is that the trial court erred in admitting into evidence his confession made on August 28, 1981. After defendant surrendered to the police, he was given time to calm down emotionally and to compose himself before he made his confession. He subsequently was read his *Miranda* warnings and made a six-page, signed confession. Defendant argues that the state failed to meet its burden of proof that defendant's confession was the product of a voluntary waiver of his right to remain silent. He also argues that the statement was made without his attorney present. Defendant's contentions are without merit on both accounts.

■ From a review of the record, we are convinced that the state met its burden of proof that defendant's confession was voluntarily and freely given. Defendant's confession was not extracted by any sort of threat, promise, or violence. In fact, the officer's testimony evinced a very real and present awareness of how important it was to give defendant time to calm down and allow his confession to be the product of an essentially free and voluntary choice. Defendant was 23 years old, and there is no allegation that he was intoxicated, drugged, or suffering from any mental impairment when he made the statement. Thus, the trial court could properly conclude that, based upon the "totality of relevant circumstances," including such factors as age, maturity, intelligence, education, experience, and ability to comprehend, defendant's statement was voluntarily given.

See *State v. Orscanin,* 283 N.W.2d 897, 899 (Minn.1979).

■ Defendant also argues that the trial court erred when it admitted his confession into evidence because he had retained counsel on an unrelated criminal matter prior to August 28, 1981, and thus, his fifth and sixth amendment rights to counsel were violated. However, defendant never told the police officers that he had previously retained counsel and that he wanted his attorney present prior to making his confession. After defendant was read his rights under *Miranda* and acknowledged that he understood his rights, he expressed no desire to speak with an attorney before making his confession. Thus, under these facts, the trial court properly concluded that defendant knowingly, intelligently, and voluntarily waived his right to counsel. See *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (a waiver of the right to counsel must be a voluntary, knowing, and intelligent relinquishment of a known right); *State v. Linder,* 268 N.W.2d 734 (Minn.1978) (under the totality of the circumstances, a defendant's waiver of right to counsel must be knowing, intelligent, and voluntary) Abuzzahab testified.

■ 3. Defendant additionally contends that it was prejudicial error to exclude the expert testimony of Dr. Frank Abuzzahab, a psychiatrist practicing psychopharmacology, that because of intoxication from ingesting alcohol and smoking marijuana, defendant could not have formed the requisite specific intent to be convicted of first-degree murder under the intentional killing of a peace officer statute. The claim is without merit, for as we held in *State v. Bouwman,* 328 N.W.2d 703 (Minn.1982), psychiatric expert testimony on the issue of a defendant's specific intent is not admissible at trial.[2.]

---

**2.** *State v. Bouwman,* 328 N.W.2d 703 (Minn. 1982), had not been decided at the time of the trial in the instant case. The trial court framed the issue in terms of whether defendant laid a sufficient foundation to admit the expert psychiatric testimony of Dr. Abuzzahab. The foundation asserted by defendant included a 20-minute pretrial conversation between Abuzzahab and

defendant. Because Abuzzahab stated that he could not give an expert opinion without relying on his previous conversation with defendant, the trial court ruled that Abuzzahab could testify only if defendant took the stand to testify to such foundational facts. Without that foundation, Abuzzahab's testimony would have been based upon hearsay, with no applicable hearsay

4. Defendant's final contention is that the intentional killing of a peace officer statute, Minn.Stat. § 609.185(4) (1982), is unconstitutional because it is discriminatory and violative of defendant's equal protection rights under the fourteenth amendment. Section 609.185(4) reads:

Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

\* \* \* \* \* \*

(4) Causes the death of a peace officer or a guard employed at a Minnesota state correctional facility, with intent to effect the death of that person or another, while the peace officer or guard is engaged in the performance of his official duties.

Defendant argues that the peace officer statute violates the equal protection clause of the fourteenth amendment solely on the basis that a person who kills a peace officer is treated differently from a person who kills any other citizen. For the peace officer statute to be held constitutional in the face of an equal protection challenge, there must be a rational basis for having enacted such a law. *See State v. Pehrson*, 205 Minn. 573, 287 N.W. 313 (1939). Although the legislative history regarding the enactment of the peace officer statute is silent, the most evident rational basis for enacting the statute was to deter the killing of peace officers.

The legislature presumably sought to protect police officers, who are highly vulnerable when engaged in the performance of their duties, by making the slaying of a peace officer a crime of first-degree murder punishable by life imprisonment. The United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), acknowledged the fact that peace officers are subject to a high risk of being killed in the line of duty. The Court stated, "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Id.* at 23, 88 S.Ct. at 1881. The Court noted, based upon the Federal Bureau of Investigation, *Uniform Crime Reports for the United States—1966*, that "[f]ifty-seven law enforcement officers were killed in the line of duty in this country in 1966, bringing the total to 335 for the seven-year period beginning with 1960." *Id.* at 24 n. 21, 88 S.Ct. at 1881 n. 21. *The Sourcebook of Criminal Justice Statistics—1982*, based upon a compilation from the same FBI sources as used in *Terry*, notes that 104 local, county, and state law enforcement officers were killed in the line of duty in 1980 and that from 1971 through 1980, a total of 1,147 law enforcement officers were slain. Since *Terry*, then, the average annual number of incidence of law enforcement officers being killed in the line of duty has virtually doubled. In light of this evidence, we conclude that there was a clear, rational basis for the legislature to deter such behavior by enacting a first-degree intentional killing of a peace officer statute. We hold, therefore, that the peace officer statute is constitutional.

Affirmed.

---

exception. Defendant had no reason to make trustworthy statements to his own expert witness that would aid present diagnosis or treatment because Abuzzahab's evaluation pertained solely to defendant's past mental state. Unlike a patient who has some motivation to tell the truth to a treating physician, for the purpose of receiving an accurate diagnosis of his health problem, defendant had an obvious motive to lie to his examining expert solely to establish an intoxication defense. Defendant's statements to his own expert witness were patently untrustworthy. Although *Bouwman* is dispositive of this issue, we observe that the trial court was clearly correct in the ruling it made.